**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| EDWARD TRIGO, | § | |
| (TDCJ-CID #1173465) | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-05-2012 |
| | § | |
| TDCJ-CID OFFICIALS, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Edward Trigo, is a former inmate of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ-CID"). Through counsel appointed by this court, Trigo alleges that the defendants, officials with the TDCJ and medical care providers working for the TDCJ, violated his constitutional rights by denying him proper medical care for Hepatitis C during his incarceration. This memorandum and opinion addresses two motions to dismiss and a motion to substitute the estate of one defendant for that defendant. The first motion to dismiss is filed by Chester Jones, Joseph Curry, David Onuora, Dr. Hung Dao, Dr. Barry Raff and Ananda Babbili (collectively referred to as the "Jones Defendants"). The second motion to dismiss is filed by Dr. Talley. (Docket Entry Nos. 84, 96). The motion to substitute seeks to put Dr. Wyatt Howell's estate in place of Dr. Wyatt Howell. (Docket Entry No. 101).

Based on the pleadings, the motions and responses, and the applicable law, this court grants both motions to dismiss and denies Trigo's motion to substitute. The reasons for these rulings are set forth in detail below.

## I.        Procedural History and Background

Trigo sued the TDCJ and certain of its officials; the University of Texas Medical Branch ("UTMB") and members of its medical staff; the Texas Tech University Health Science Center and members of its medical staff; Chester Jones and Joseph Curry, physician assistants with the UTMB; Dr. Wyatt Howell, a physician working for the Price Daniel Unit of the TDCJ; Dr. Denise DeShields, the Regional Director, Office of Health Care Systems for the UTMB; and Lanette Linthicum, the Division Director for Health Services at TDCJ.   After initial dismissal by this court, partial reversal, and remand, defendants Linthicum, Jones, Curry, Raimer, and DeShields filed an answer and jury demand.  (Docket Entry No. 30).  On June 8, 2007, the Texas Attorney General's Office filed a suggestion of death as to Dr. Wyatt Howell.  (Docket Entry No. 31).

On October 30, 2009, Trigo, through counsel, filed a first amended complaint.  He reasserted the claims against Chester Jones and Joseph Curry, Dr. Wyatt Howell, and Dr. Denise DeShields. He also named the following new defendants: David Onuora, Physician Assistant, UTMB/TDCJ-RMF; Dr. Hung Dao, M.D., Holliday Unit; Dr. Sheri Talley, M.D., Price Daniel Unit; Dr. Barry Raff, M.D., Sanders Estes Unit; and Ananda Babbili, Physician Assistant, UTMB/TDCJ-RMF. (Docket Entry No. 82, pp. 1-2).  Dr. DeShields filed a motion to dismiss, which this court granted in part and denied in part, dismissing the claims based on respondeat superior and retaining the claims relating to her alleged role in setting, monitoring, and enforcing TDCJ policy on treating Hepatitis C.  (Docket Entry No. 65).

The Jones Defendants—Chester Jones, Joseph Curry, David Onuora, Dr. Hung Dao, Dr. Barry Raff, and Ananda Babbili—have moved to dismiss Trigo's First Amended Complaint against Jones and Curry on the ground that Trigo failed to exhaust his state-court remedies.  The Jones

Defendants also move to dismiss the claims against David Onuora, Dr. Hung Dao, Dr. Barry Raff, and Ananda Babbili on the grounds that limitations expired.  (Docket Entry No. 84).  Trigo responded, (Docket Entry No. 88), and the Jones Defendants replied.  (Docket Entry No. 91).  Dr. Talley also moved to dismiss on these grounds, (Docket Entry No. 96), and Trigo responded, (Docket Entry No. 100). Trigo has filed a motion to substitute Dr. Wyatt Howell's estate in place of Dr. Wyatt Howell.  (Docket Entry No. 101). The defendants Denise DeShields and Sheri Talley have responded to this motion. (Docket Entry No. 102).

These motions and responses are addressed below.

## II.    The Allegations in the Amended Complaint

In an order entered on December 16, 2005, this court summarized the allegations in Trigo's original complaint as follows:

> In July 2003, while Trigo was incarcerated at the Holliday Unit, he was diagnosed with hepatitis C virus, diabetes, and high blood pressure.  Prison officials placed Trigo in the Managed Health Care Program, under which his liver enzyme levels were monitored every ninety days.  On July 10, 2003, Physician's Assistant Jones evaluated Trigo and found that his alanine aminotransferase ("ALT")[1] level was 59 and his AST was 47.  Blood work performed on July 31, 2003 showed his ALT to be 152 and AST to be 114.  Trigo told Physician's Assistant Curry about the rapid rise in his enzyme levels.  Physician's Assistant Curry told Trigo that the TDCJ-CID would not treat him for hepatitis C until Trigo had been in the "system" for at least one year.  Physician's Assistant Curry also advised Trigo that the increase in liver enzymes was due to the nature of the disease.  By January 2004, Trigo's ALT was 378, and his AST level was 166.  Medical personnel did not refer Trigo to a specialist for additional liver tests.

---

[1]    ALT is an enzyme that appears in liver cells.  An increase in ALT levels is an indicator of acute liver cell damage.  Stedman's Medical Dictionary 40 (27th ed. 2000); Hepatitis C International Website, available at http://www.focusonhepc.com/alt.html.

At the Price Daniel Unit, a nurse told Trigo that although he met the criteria to begin treatment at the TTUHSC, he would not be treated because he had a discretionary parole release date of August 23, 2004, which meant that there was insufficient time to complete the treatment.  In June 2004, the Texas Board of Pardons and Paroles denied Trigo release on parole and scheduled Trigo for another parole review in August 2005.  In August and October 2004, Trigo asked to be reconsidered for treatments but was told that his enzyme levels were too high and that he no longer met the criteria for treatment.  Trigo blames the TTUHSC Medical Committee for these delays in his treatment.

In January 2005, Trigo was transferred from the Daniel Unit to the Estes Unit, where Trigo underwent a medical evaluation.  Physician's Assistant Babbili and Dr. Turner determined that Trigo should be transferred to John Sealy Hospital in Galveston to treat possible kidney and heart failure.   Doctors at John Sealy Hospital told Trigo that he had cirrhosis of the liver.  On his return to the Estes Unit, Dr. Raff told Trigo that he would not be treated for Hepatitis C Virus because of complicating factors.

On April 4, 2005, a nurse told Trigo that because of the cirrhosis of the liver, Trigo would not be treated for Hepatitis C Virus.  Trigo suffered from edema in both legs and a distended abdomen.  Trigo was again transferred to John Sealy Hospital on April 22, 2005, where a physician told Trigo that he would require a liver transplant within five years.  The physician also removed fluid from Trigo's abdominal region.   Trigo was evaluated by a gastrointestinal specialist and referred to a hepatologist.  Upon his return to the Estes Unit, Trigo's medications were altered.

Trigo was seen by medical personnel on the following dates: July 10, 2003; July 17, 2003; July 31, 2003; August 10, 2003; March 4, 2004; May 21, 2004; June 5, 2004; June 8, 2004; August 20, 2004; August 25, 2004; October 10, 2004; January 13, 2005; January 21, 2005; January 24, 2005; February 7, 2005; April 4, 2005; April 22, 2005; May 4, 2005; hospitalized January 24 to 28, 2005; and hospitalized April 22 to 25, 2005.

Trigo alleges that the failure to treat the Hepatitis C Virus lead to cirrhosis of the liver.  He complains the defendants failed to provide him with prompt and proper medical treatment.  He asserts the defendants should have provided him with Interferon/Ribavirin therapy.

4

(Docket Entry No. 11, pp. 1-3).

Trigo stated:

> 26.  Plaintiff alleges that the non-treatment of his serious medical condition, Hepatitis C, led directly to cirrhosis of the liver.  The Plaintiff's condition continues to worsen and could lead to cancer of the liver and inevitably to a premature death.  The defendants failed to provide the Plaintiff with prompt and proper medical treatment and by ignoring Plaintiff's serious medical need shows deliberate indifference that caused the wanton infliction of pain and suffering. The defendants set in motion the natural and unbroken chain of events that led directly and proximately to a reasonably foreseeable injury, i.e. cirrhosis of the liver.

(Docket Entry No. 2, p. 9).

In his amended complaint filed on October 30, 2009, Trigo alleged that he began his incarceration with TDCJ at the Travis County Jail on May 9, 2003 and was transferred to the Holliday Unit in Huntsville on July 3, 2003.  On July 10, 2003, physician assistant Chester Jones evaluated Trigo and ordered lab tests for Hepatitis C.  The lab tests included an ALT test to measure the amount of liver enzyme in the blood.  The normal range, according to UTMB, is 9 to 51.  Trigo's ALT level was 59.  On  July 17, 2003, a chronic care  nurse told Trigo that he had Hepatitis C. Trigo was placed on a "managed health care program," under which he received liver evaluations every 90 days.

On July 31, 2003, Trigo underwent additional lab tests for Hepatitis C.  These tests showed that his ALT level had risen to 162.  An ALT level above 51—the upper limits of normal—is an indication of liver damage.  On August 10, 2003, Trigo saw physician assistant Joseph Curry.  Trigo explained to Curry that he was concerned about the rapid rise in his liver enzyme levels and that he wanted to be treated for Hepatitis C.  Curry responded that under Policy B14.13 of the TDCJ Health

Services Division Infection Control Manual, Trigo could not be considered for Hepatitis C treatment until he had been incarcerated for at least one year.

On January 13, 2004, Dr. Hung Dao and physician assistant David Onuora examined Trigo and ordered liver enzyme tests. The reports showed that Trigo's ALT level was 378. This was the second liver enzyme test within six months that showed Trigo's ALT level as more than twice the upper limits of normal. Trigo was eligible for Hepatitis C treatment under Policy B-14.13 at this point. He alleges that Dr. Hung Dao, Chester Jones, Joseph Curry, and David Onuora took no action. During the eight months that Trigo was under their care, he was never referred to a liver specialist for a further liver evaluation or recommended for Hepatitis C treatment under the "clinical pathway" described in Policy B-14.13. Trigo alleges that Dr. Dao, Jones, Curry, and Onuora were deliberately indifferent to his serious medical need for Hepatitis C treatment. (Docket Entry No. 82, Amended Complaint, p. 3).

TDCJ transferred Trigo to the Byrd Unit on February 11, 2004 and to the Price Daniel Unit on February 20, 2004. Trigo received a medical evaluation from Dr. Wyatt Howell at the Price Daniel Unit on March 1, 2004. Trigo told Dr. Howell and CID Nurse Babbs about his high liver enzyme levels and asked for treatment for his hepatitis. Dr. Howell responded that he had to order lab work and submit the request to a committee at Texas Tech for a decision on whether Trigo met TDCJ's criteria for treatment. Trigo's lab results came back on March 8, 2004. They showed that his ALT level was 469. The normal ALT range set by Texas Tech was 30-65.

On April 22, 2004, Dr. Sheri Talley denied Trigo's request for Hepatitis C treatment. The decision was based on the provision of Policy B-14.13 that an inmate with less than six months remaining on his prison sentence was ineligible for treatment because it could not be completed

6

within the period of incarceration.  Trigo had less than six months remaining before his projected date for release on parole of August 23, 2004.

On May 21, 2004, Babbs told Trigo that Texas Tech had denied his request for Hepatitis C treatment under Policy B-14.13 because, although he otherwise met the criteria for treatment, he had a discretionary release date of August 23, 2004 and therefore might be unable to complete the treatment while incarcerated.  Neither Babbs nor anyone else asked Trigo if he would be able to continue the treatment if he was released before it was completed.

In June 2004, Trigo received a letter from the parole board denying his discretionary release date of August 23, 2004 and stating a new release date of May 8, 2006.  On June 5, 2004, Trigo told Babbs about the parole board's action and asked to be treated for Hepatitis C.  Babbs told Trigo that he would have to resubmit his paperwork to Texas Tech for approval.  On July 21, 2004, Dr. Talley denied Trigo's request for Hepatitis C treatment because his serum creatinine level was greater than the upper limits of the normal range and his iron and ferritin levels were elevated.  On  August 20, 2004, Babbs informed Trigo that Texas Tech had denied his request for Hepatitis C treatment because his creatinine and ferritin levels were slightly above the criteria set by Texas Tech.

On October 10, 2004, Dr. Howell again denied Trigo's request for Hepatitis C treatment.  At that time, Trigo's hemoglobin A1C level was 5.9, slightly above what Texas Tech set as the upper limit of normal, 5.7.  TDCJ transferred Trigo to the Estes Unit on January 5, 2005.  On January 13, 2005, Dr. Barry Raff performed an initial medical evaluation at the Estes Unit.  Dr. Raff told Trigo that after lab work, he would evaluate Trigo's medications because they were designed for a person with normal liver function and might have been contributing to the increased creatinine and ferritin levels. Dr. Raff changed Trigo's medications to 40 mg. per day of Hydrochlothiazide

and 40 mg. per day of Furosemide, and discontinued Ranitidine and enteric aspirin.  A blood test on January 13, 2005 showed an ALT level of 233.  The Estes Unit used the ALT normal range set by UTMB of 0-40.

On January 24, 2005, physician assistant Ananda Babbili called Trigo to the infirmary.  Trigo told Babbili that he was not feeling well.  He had pitting edema in both legs from his knees to his toes and a distended abdomen.  Trigo was told that he might be going into heart and/or kidney failure.  Dr. Turner and Babbili decided via videoconference to transport Trigo to the John Sealy Hospital in Galveston.  The next day, Dr. Lafuente and Dr. Miller ordered lab work and a sonogram of Trigo's heart, liver, and abdomen.  On January 27, 2005, Dr. Lafuente and Dr. Miller informed Trigo that his heart and kidneys were fine, but he had cirrhosis of the liver.  On January 28, 2005, Trigo was discharged from John Sealy Hospital and was transported to the Estelle Unit to await transportation to the Estes Unit.

Trigo arrived at the Estes Unit on February 16, 2005.  The following day, Trigo asked Dr. Raff about submitting a request for Hepatitis C treatment.  Dr. Raff told Trigo that he would not treat him for Hepatitis C because of complicating factors caused by the cirrhosis.  On February 28, 2005, Trigo spoke with CID Nurse Smith about applying for Hepatitis C treatment.  Smith told Trigo that she would have to review his records and consult with Babbili to decide how to proceed.  On April 4, 2005, Trigo attended an appointment with Babbili to address pitting edema in both of his legs from his knees to his toes, as well as a severely distended abdomen.  Babbili administered 8 cc of Furosemide and increased Trigo's Spironolactone from 100 mg. per day to 150 mg. per day.  Babbili told Trigo that UTMB would not treat him for Hepatitis C because of the cirrhosis.

On April 10, 2005, Trigo submitted a sick call request and told the nurse that his condition had not changed since April 4, 2005.  The nurse decided not to change Trigo's treatment until he could be transported to John Sealy Hospital to see a gastrointestinal specialist.  On April 20, 2005, Trigo submitted another sick call request and told the nurse that his condition had worsened.  On April 22, 2005, a nurse examined Trigo and determined that he had a severely distended abdomen and +4 pitting edema in both legs from his knees to his toes.  Dr. Turner examined Trigo via video conference and determined that he needed to be transferred to John Sealy Hospital immediately.  On April 23, 2005, an internal medicine doctor at John Sealy examined Trigo and told him that he would need a liver transplant in the next five years and should not expect to live to be an old man. Trigo also underwent a paracentesis procedure to remove excess fluid from his abdomen.  Trigo lost 22 pounds of fluid during his hospital stay.

On June 9, 2005, Trigo filed this lawsuit.  On May 8, 2006, Trigo was released from TDCJ. Following his release, Trigo received treatment for his Hepatitis C from the VA hospital.  The treatment cleared the Hepatitis C infection, but Trigo still suffers from cirrhosis and will eventually require a liver transplant.  (Docket Entry No. 82).

## III.   The Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to Relief." FED. R. CIV. P. 8(a)(2).  *Twombly* abrogated the Supreme Court's prior statement in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Twombly,* 550 U.S. at 562-63 ("*Conley*'s 'no set of facts' language . . . is best forgotten as an incomplete, negative gloss on an accepted pleading standard. . . ."). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office,* 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly,* 550 U.S. 544).

In *Ashcroft v. Iqbal,* the Supreme Court elaborated on the two principles underlying its decision in *Twombly.* --- U.S. ----, 129 S. Ct. 1937, 1949 (2009). First, under Rule 8(a)(2), plaintiffs are not required to include "'detailed factual allegations,' but more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation' is needed." *Id.* (quoting *Twombly,* 550 U.S. at 555). Second, the Court noted that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556).

"A document filed *pro se* is 'to be liberally construed,' . . . and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Under this standard, pleadings filed by a *pro se* litigant are entitled to a liberal construction that affords all reasonable inferences which can be drawn from them. *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)*; Oliver v. Scott,* 276 F.3d 736, 740 (5th Cir. 2000).

10

A court generally must limit itself to the contents of the pleadings in considering a Rule 12(b)(6) motion but may consult documents attached to the defendant's motion if "'they are referred to in the plaintiff's complaint and are central to [its] claim.'"  *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir. 1993)).  In addition, "a complaint that shows relief to be barred by an affirmative defense, such as the statute of limitations, may be dismissed for failure to state a cause of action."  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied,* 459 U.S. 1105 (1983); *accord La Porte Constr. Co. v. Bayshore Nat'l Bank of La Porte,* 805 F.2d 1254, 1255 (5th Cir. 1986).  A plaintiff's noncompliance with the applicable statute of limitations "'may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like.'"  *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir. 2003), *cert. denied,* 540 U.S. 1161 (2004)); *see Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.,* 512 F.3d 137, 141 (5th Cir. 2007); *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378-79 (5th Cir. 2002), *cert. denied,* 537 U.S. 1200 (2003).  "Although defendants bear the burden of pleading and proving affirmative defenses, where facts alleged in plaintiff's pleadings make clear that a claim is barred, dismissal under Rule 12(b)(6) may be granted."  *In re Dynegy, Inc. Secs. Litig.,* 339 F. Supp.2d 804, 819 (S.D. Tex. 2004).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs

advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.,* 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).   However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson,* 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) (per curiam) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.,* 195 F.3d 765, 771 (5th Cir. 1999))).

## IV.    The Statute of Limitations

The motions to dismiss filed by Dr. Talley and the Jones Defendants, and the responses filed by Trigo, raise similar legal arguments but are based on different facts.  The factual basis of each motion is set out below.

### A.    The Claims Against the Jones Defendants

The Jones Defendants argue that Texas law does not permit relation-back of an amendment when, as here, the plaintiff attempts to add a new party after the statute of limitations has expired. The Jones Defendants argue that Trigo's claim accrued no later than June 2005, when he filed his original complaint under § 1983, and that limitations expired no later than June 2007.  As a result, the Jones Defendants argue that Trigo could not add Dao, Onuora, Babbili, and Raff as defendants in 2009.

12

Trigo responds that the Jones Defendants are not entitled to dismissal on statute of limitations grounds because they fail to meet their burden of demonstrating the affirmative defense on the face of the pleadings. (Docket Entry No. 88, p. 3). The Jones Defendants ask the court to "presume" that Trigo's claim accrued no later than June 2005. Trigo argues that this presumption is not supported by the pleadings because the critical facts necessary to trigger the accrual of the claims—the identification of Dao, Onuora, Babbili, and Raff as individuals responsible for Trigo's injuries — were not discovered until early 2009. Trigo further argues that even if his claims accrued more than two years before he filed the First Amended Complaint naming Dao, Onuora, Babbili, and Raff, the statute of limitations should be equitably tolled. Trigo emphasizes as grounds for equitable tolling that he is not a lawyer. Trigo maintains that although legal counsel was appointed for Trigo on at least three prior occasions, the record does not indicate that these counsel sought discovery. Only after current counsel was appointed in November 2008—after the defendants assert the statute expired—did Trigo discover the identity of all the individuals responsible for denying him treatment. Trigo asserts that he has been diligent in prosecuting this action and that the court should not permit the defendants invoking limitations to escape accountability because he lacks medical and legal knowledge. The Jones Defendants dispute Trigo's argument that limitations should be tolled because no discovery was conducted until November 2008, when his current lawyers were appointed. (Docket Entry No. 91, p. 3). The Jones Defendants argue that this contention is unsupported by the record.

The court's docket indicates that disclosures were exchanged between the defendants and Trigo's former appointed counsel on August 8, 2007. (Docket Entry Nos. 37, 38). At that time, Trigo was represented by Craig Olsen, who was appointed by this court on June 19, 2007. (Docket

Entry No. 32).  Olsen represented Trigo until October 15, 2007, when Andrew Swartz substituted in.  (Docket Entry No. 43).  Swartz represented Trigo until an unopposed motion to withdraw was granted on July 3, 2008.  (Docket Entry Nos. 54, 56).  The Jones Defendants insist that through counsel, Trigo was in possession of the treatment records, grievances, and other documents relevant to his claim for more than two years before he filed his First Amended Complaint naming Dao, Onuora, Babbili, and Raff.

### B.    The Claims Against Dr. Talley

In his amended complaint, Trigo alleges that Dr. Talley denied his requests for Hepatitis C treatment on April 22, 2004 and July 21, 2004.  Based upon Trigo's allegations against Dr. Talley, the two-year statute of limitations expired on July 21, 2006.  Trigo's original complaint was filed on June 9, 2005.  (Docket Entry Nos. 1-2).  His more definite statement, specifically naming each defendant and identifying the alleged conduct that constituted deliberate indifference, was filed on August 18, 2005.  (Docket Entry No. 6).  Trigo's allegations in the more definite statement are based on events occurring during his incarceration in TDCJ from July 3, 2003 to May 4, 2005.  (Docket Entry No. 6, Plaintiff's More Definite Statement, pp. 1, 4, 13).  Dr. Talley was not named as a defendant in the original complaint or referred to in the more definite statement.  Trigo did not name Dr. Talley or suggest that he intended to bring suit against her until October 30, 2009, over five years after the events about which he complains and over three years after the statute of limitations expired.  Trigo responds that Dr. Talley is not entitled to dismissal on the basis of limitations grounds because she failed to demonstrate the presence of this affirmative defense on the face of the pleadings and did not address the fact that Trigo did not identify Dr. Talley as an individual responsible for the injuries until 2009.  (Docket Entry No. 100, p. 2).  Alternatively, Trigo argues

that limitations should be equitably tolled based on his lack of effective legal representation before November 2008.

### C.    Analysis

Because there is no federal statute of limitations for § 1983 actions, federal courts borrow the forum state's general personal injury limitations period. *Wallace v. Kato,* 549 U.S. 384, 387 (2007); *Owens v. Okure,* 488 U.S. 235, 249-50 (1989).  Texas has a two-year limitations period for personal injury actions. TEX. CIV. PRAC. AND REM. CODE ANN. § 16. 003(a).  Although state law determines the length of the limitations period under § 1983, federal law determines when the cause of action accrues.  *Gartrell v. Gaylor,* 981 F.2d 254, 257 (5th Cir. 1993).  Generally, in Texas, "a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex. 2003) (citing *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex. 1996)); *Childs v. Haussecker,* 974 S.W.2d 31, 36 (Tex. 1998).  A cause of action generally accrues, and the statute of limitations begins to run, when facts exist that authorize a claimant to seek a judicial remedy. *Johnson & Higgins of Tex. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex. 1998). Stated  another way, "a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex. 1996).  "[L]imitations begin[s] to run when the fact of injury is known, not when the alleged wrongdoers are identified." *Russell v. Ingersoll-Rand Co.,* 841 S.W.2d 343, 344 n.3 (Tex. 1992) (citation & internal quotation marks omitted).  Texas law recognizes two general theories to avoid limitations by delaying the accrual date: the discovery rule and the  fraudulent concealment doctrine. *S.V.,* 933 S.W.2d at 4-5.

1.      *The Discovery Rule*

The discovery rule defers limitations until a plaintiff discovers, or through the exercise of reasonable care and diligence should have discovered, facts indicating that he has been injured. *See TIG Ins. Co. v. Aon Re, Inc.,* 521 F.3d 351, 357 (5th Cir. 2008) (citing *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886 (Tex. 1998)); *Colonial Penn Ins. v. Market Planners Ins. Agency,* 157 F.3d 1032, 1034 (5th Cir. 1998); *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734 (Tex. 2001) (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex. 1996)). "The rule delays the statute of limitations only until the claimant knows or should know the facts that could support a cause of action, not until she realizes that the facts do support a cause of action." *Colonial Penn Ins.,* 157 F.3d at 1034. "'It does not operate to toll the running of the limitation period until such time as plaintiff discovers all of the elements of a cause of action.'" *Id.* (quoting *Coody v. A.H. Robins Co.,* 696 S.W.2d 154, 156 (Tex. App. - San Antonio 1985, writ dism'd by agr.)); *Reynolds v. Guido,* 166 S.W.3d 789, 793 (Tex. App. - Dallas 2005, pet. denied).

The discovery rule is generally limited to situations in which "the *nature* of the injury is inherently undiscoverable and the *evidence* of the injury is objectively verifiable." *Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex. 2006) (quoting *Computer Assocs. Int'l, Inc.,* 918 S.W.2d at 456); *Wagner & Brown, Ltd.,* 58 S.W.3d at 735; *see Colonial Penn Ins.,* 157 F.3d at 1035; *Childs,* 974 S.W.2d at 36; *S.V.,* 933 S.W.2d at 4-5. An injury is "inherently undiscoverable" if it "is unlikely to be discovered within the prescribed limitations period despite the exercise of due diligence." *Seureau v. ExxonMobil Corp.,* 274 S.W.3d 206, 227-28 (Tex. App. - Houston [14th Dist.] 2008, no pet. h.) (emphasis omitted) (citing *Wagner & Brown, Ltd.,* 58 S.W.3d 734-35); *see Computer Assocs. Int'l, Inc.,* 918 S.W.2d at 456. An injury is "objectively verifiable" if its existence

16

and the defendant's wrongful act cannot be disputed and the facts on which liability is asserted are demonstrated by direct physical evidence. *Hay v. Shell Oil Co.,* 986 S.W.2d 772, 777 (Tex. App. - Corpus Christi 1999, pet. denied).

A defendant bears the burden of establishing the affirmative defense of limitations, including the accrual date of a plaintiff's claims. *See Diversicare Gen. Partner, Inc. v. Rubio,* No. 2-0849, 49 Tex. Sup. Ct. J. 19, 2005 WL 2585490, at *2 (Tex. Oct. 14, 2005). A defendant asserting a limitations defense at the pleading stage has the burden to establish the accrual date, including negating the applicability of the discovery rule. *Doe v. Linam,* 225 F. Supp.2d 731, 735 (S.D. Tex. 2002) (citing *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 n.2 (Tex. 1988)).

Trigo argues that the limitations period for his medical care claims did not begin to run until 2009, when the third set of appointed counsel obtained medical records in discovery. But the record shows that Trigo's allegations as early as 2005 show that he knew the basis of his claim and the identities of many of the medical and prison personnel involved in denying him treatment.

In his original complaint filed on June 9, 2005, Trigo complained of the lack of treatment for Hepatitis C. He alleged that between July 10, 2003 and April 2005, he received medical examinations, evaluations, and tests — but no treatment — relating to Hepatitis C. He alleged that on April 4, 2005, a nurse told him that because he had cirrhosis of the liver, he would still not be treated for the virus. As early as April 2005, Trigo knew that he had Hepatitis C, that he had been denied treatment for it since 2003, and that he had developed cirrhosis of the liver.

In his original *pro se* complaint filed on June 9, 2005, Trigo stated as follows:

> 26. Plaintiff alleges that the non-treatment of his serious medical condition, Hepatitis C, led directly to cirrhosis of the liver. The Plaintiff's condition continues to worsen and could lead to cancer of the liver and inevitably to a premature death. The defendants failed

17

> to provide the Plaintiff with prompt and proper medical treatment and by ignoring Plaintiff's serious medical need shows deliberate indifference that caused the wanton infliction of pain and suffering. The defendants set in motion the natural and unbroken chain of events that led directly and proximately to a reasonably foreseeable injury, *i.e.*, cirrhosis of the liver.

(Docket Entry No. 2, p. 9).

The discovery rule does not apply here. The general rule is that "a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex. 1996). This is not a case in which "the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred . . ." or more than two years afterwards. *Id.* at 6. An injury is inherently undiscoverable only "if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.* at 7. Trigo alleged in June 2005 that the lack of treatment for Hepatitis C beginning in July 2003 caused his cirrhosis.

In his memorandum in support of his complaint, Trigo referred to Dr. Barry Raff and Ananda Babbili and described their role in treating his medical condition, although he did not name them as defendants. Trigo asserts that he did not learn of the identities of the Jones Defendants (Onuora, Dao, Babbili, and Raff) or Dr. Talley until his third appointed counsel conducted discovery in 2009. The record shows that on June 19, 2007, Craig Olsen was appointed to represent Trigo. (Docket Entry No. 32). On August 8, 2007, the parties served their initial disclosures. (Docket Entry Nos. 37, 38). In their initial disclosure, the defendants state that they produced the following documents:

(1)     TDCJ Health Services Archives Medical Records of Edward Trigo;

(2)     Correctional Managed Health Care Infection Control Manual, Policy #B-14.13; and

18

(3)     University of Texas Medical Branch Galveston, Texas - Medical Records.

(Docket Entry No. 37, p. 1).  A copy of these documents was not submitted to the court.

When Trigo filed his original complaint in June 2005, he alleged that the TDCJ's policy on treating Hepatitis C had denied him treatment from 2003 to 2005 and caused his cirrhosis.  Trigo's cause of action accrued no later than June 2005, not when he learned of the identities of all the various medical personnel who allegedly denied him proper medical care.  "[L]imitations begin[s] to run when the fact of injury is known, not when the alleged wrongdoers are identified." *Russell v. Ingersoll-Rand Co.,* 841 S.W.2d 343, 344 n.3 (Tex. 1992) (citation and internal quotation marks omitted).  The discovery rule did not apply to toll the limitations period until Trigo learned of the identities of all medical personnel involved in his treatment.  The injury—cirrhosis—was not "inherently undiscoverable" after April 2005.  It is evident from Trigo's complaint that his claims accrued, at the latest, on June 9, 2005.  The statute of limitations expired on June 9, 2007.  Trigo filed his amended complaint naming Onuora, Dao, Babbili, Raff, and Dr. Talley as defendants. (Docket Entry No. 82).  Trigo filed this amended complaint on October 30, 2009, more than two years after the limitations period expired.  The discovery rule does not toll limitations as to the claims against Onuora, Dao, Babbili, Raff, and Dr. Talley.

2.     *The Fraudulent Concealment Exception*

Under the fraudulent concealment exception to the general rule on when a claim accrues, "accrual is deferred because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V.,* 933 S.W.2d at 6.  In such cases, the limitations period is tolled "until such time as the plaintiff learned of, or should have discovered, the deceitful conduct or the facts giving rise to the cause of action." *Earle v. Ratliff,* 998 S.W.2d

19

882, 888 (Tex. 1999); *see also Nichols v. Smith,* 507 S.W.2d 518, 519 (Tex. 1974) (noting that, in

an instance of fraudulent concealment, "the guilty party will be estopped from relying on the defense

of limitations until the right of action is, or in the exercise of reasonable diligence should be,

discovered").  "Notably, this is the same standard that applies to the discovery rule." *Trousdale v.*

*Henry,* 261 S.W.3d 221, 235 (Tex. App. - Houston [14 Dist.] June 24, 2008, pet. filed).

Under Texas law, fraudulent concealment is an affirmative defense to an assertion that the

statute of limitations has run.  *Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1366 (1984).  In

*Nichols v. Smith,* 507 S.W.2d 518, 519 (Tex. 1974), the Texas Supreme Court described the doctrine

as follows:

> When the defendant is under a duty to make a disclosure but
> fraudulently conceals the existence of a cause of action from the one
> to whom it belongs, the guilty party will be estopped from relying on
> the defense of limitations until the right of action is, or in the exercise
> of reasonable diligence should be, discovered.
>
> A successful assertion of fraudulent concealment requires the
> plaintiff to prove that the defendant had actual knowledge of the facts
> allegedly concealed, and a fixed purpose to conceal the wrong.  The
> mere failure to disclose a cause of action, or its mere concealment,
> does not constitute fraudulent concealment for purposes of tolling the
> statute of limitations.  Rather, the plaintiff is under a duty to exercise
> reasonable diligence to discover his or her cause of action. . . .  There
> cannot be fraudulent concealment of facts which admittedly were or
> should have been known by the plaintiff.

"[P]roof of fraudulent concealment . . . requires evidence that the defendant actually knew

the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff." *Earle v. Ratliff,*

998 S.W.2d at 888.  As a Texas intermediate court explained:

> The estoppel effect [of fraudulent concealment] ends, and the statute
> of limitations begins to run when a plaintiff has knowledge of facts,
> conditions or circumstances that would cause a reasonable person to

> make an inquiry, which, if pursued, would lead to discovery of the
> concealed cause of action, because such knowledge is the equivalent
> for limitations purposes of knowledge of the cause of action itself.

*Winn v. Martin Homebuilders, Inc.,* 153 S.W.3d 553, 558 (Tex. App. - Amarillo 2004, no pet.).

Trigo appears to argue that the defendants' failure to produce the documents sooner was a form of fraudulent concealment. But mere silence by a defendant is not fraudulent concealment. Rather, the defendant must engage in affirmative acts of concealment. *See State of Texas v. Allan Constr. Co.,* 851 F.2d 1526, 1528-29 (5th Cir. 1988). "[G]enerally speaking, denial of wrongdoing is no more an act of concealment than is silence." *Id.* at 1532 (footnote omitted). Courts have recognized that "a denial may constitute concealment if the parties are in a fiduciary relationship, or when circumstances indicate that it was reasonable for the plaintiff to rely on defendant's denial." *Id.* at 1532-33 (footnote omitted). Even if there is a concealment of wrongful conduct, a plaintiff is not relieved of his duty of diligence:

> Even where a defendant has concealed wrongful conduct, the
> statute of limitations is tolled only until such time as the plaintiff,
> exercising reasonable diligence, could have discovered the facts
> forming the basis for the claim. Moreover, the plaintiff need not have
> actual knowledge of such facts; those who have learned of facts
> calculated to excite inquiry must inquire.

*Id.* at 1533 (footnote, quotation marks & brackets omitted).

In this case, the record does not show that the defendants engaged in affirmative acts of concealment. Trigo requested treatment for Hepatitis C, and the defendants told him why he did not satisfy the criteria for treatment. The defendants did not conceal the reason for the denial of treatment. Nor did the defendants conceal the identities of those involved in treating Trigo or in deciding on his treatment. In his original complaint, Trigo described his efforts to obtain treatment

and the reasons the defendants gave him for denying him treatment.  The record does not provide a basis for tolling limitations based on fraudulent concealment.

### D.      The Motion for Leave to Amend to Add Defendants

Trigo's original complaint and his more definite statement asserted claims against the TDCJ and certain of its officials; the University of Texas Medical Branch and certain of its medical staff; the Texas Tech University Health Science Center and certain of its medical staff; unknown individuals working with those institutions; [Chester] Jones, P.A., UTMB/TDCJ-RMF; Joseph Curry, P.A., UTMB/TDCJ-RMF; Dr. Wyatt Howell, Price Daniel Unit; and Dr. Denise DeShields, Regional Director, Office of Health Care Systems.  When he filed his original complaint, Trigo was proceeding *pro se.*  In 2009, Trigo moved for leave to amend his complaint to name David Onuora, Dr. Hung Dao, Dr. Sheri Talley, Dr. Barry Raff, and Ananda Babbili as additional defendants who denied him medical care.  Unless the claims against the new defendants in the proposed amended complaint relate back to the date the original complaint was filed, limitations will make the proposed amendment to add these defendants futile.

A party who timely files a complaint may amend the complaint by adding new parties after the applicable statute of limitations has run provided the requirements of Federal Rule of Civil Procedure 15(c) are met.  *See Krupski v. Costa Crociere S. p. A.,*[2] --- U.S. ----, 130 S. Ct. 2485, 2496

---

[2]    The plaintiff in *Krupski* sued Costa Cruise Lines, N.V. for an injury she suffered on board a cruise ship.  Costa Cruise Lines, N.V., however, was only the "sales and marketing agent" for Costa Crociere S.p.A., the entity that actually owned, chartered, and operated the ship on which the plaintiff was injured. When the plaintiff eventually amended her complaint to name Costa Crociere, the district court granted that defendant's motion to dismiss on statute-of-limitations grounds, finding that there was no relation back, and the Eleventh Circuit affirmed on the grounds that the plaintiff either knew or should have known of the proper party's identity and thus determined that she had made a deliberate choice instead of a mistake in not naming Costa Crociere as a party in the original complaint.

(2010).  If the requirements of Rule 15(c) are met, the amended complaint will "relate back" to the date the original complaint was filed.  *Krupski*, --- U.S. at ----, 130 S. Ct. at 2496.  Rule 15(c) states:

> (c) Relation Back of Amendments.
>
> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out– or attempted to be set out–in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. P. 15(c).

Under Rule 15(c)(1)(C)(ii), a plaintiff who files suit within the limitations period may amend his complaint to change a defendant's name or substitute a correctly named defendant for one named by mistake, so long as the newly named defendants had notice of the suit and knew or should have known that but for a mistake, they would have been named within the limitations period.  Rule 15(c)(1)(C)(ii) requires that the newly named defendants "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity."  The Supreme Court has recently stated that "[t]he question under Rule 15(c)(1)(C)(ii) is not whether

[the plaintiff] knew or should have known the identity of [the newly named defendant] as the proper

defendant, but whether [the newly named defendant] knew or should have known that it would have

been named as a defendant but for an error.   Rule 15(c)(1)(C)(ii) asks what the prospective

*defendant* knew or should have known during the Rule 4(m) period."  *Krupski, supra,* --- U.S. at ----,

130 S. Ct. at 2493-94 (emphasis in original).   Information in the plaintiff's possession is relevant

only as it relates to the defendant's understanding of whether there was a mistake concerning the

proper party's identity.  *Id.*  Further, the plaintiff's knowledge that a party exists does not preclude

the plaintiff from making a mistake with regard to the proper party's identity.  *Id.*  The proper inquiry

under Rule 15(c)(1)(C)(ii) is whether the newly named defendant knew or should have known that

but for the plaintiff's mistake, the action would have been brought against him.  *Id.*

The Fifth Circuit has held that Rule 15(c) relation-back is not available to a plaintiff who

sues "John Doe" because the plaintiff does not know who the defendant is.  *See Jacobsen v.

Osborne*, 133 F.3d 315, 320 (5th Cir. 1998).  In *Jacobsen,* the plaintiff filed a § 1983 action against

a named police officer and an unnamed deputy identified as "John Doe," claiming false arrest and

abuse by an  officer and sheriff's deputies.  After the statute of limitations had expired, the arrestee

moved to amend to add as defendants the actual arresting officers and deputies, whose identities he

had learned through discovery.  The district court denied the motion and entered judgment for the

defendants. On appeal, the Fifth Circuit held that: (1) the amended pleading related back to the

original complaint with respect to the claim against the arresting officer named in the original

complaint, but (2) the attempted substitution of the actual officer for the "John Doe" defendant did

not relate back.  "[F]or a 'John Doe' defendant, there [i]s no 'mistake' in identifying the correct

defendant; rather, the problem [i]s not being able to identify that defendant."  *Jacobsen,* 133 F.3d

24

at 321.  As a result, the plaintiff "was prevented from availing himself of the relation back doctrine of Rule 15(c)."  *Id*. at 321.

Putting aside this issue, there is no dispute that the claims Trigo wishes to bring against the newly added defendants "arose out of the conduct, transaction, or occurrence set out–or attempted to be set out– in the original pleading."  The second and third requirements of Rule 15(c)(1)(C) are at issue.  If Trigo named the additional medical personnel as defendants, he could not show that the additional medical personnel received timely notice of this lawsuit, as required by Rule 15(c)(1)(C)(i).  Linthicum, Raimer, Jones,  Curry,  Howell, and  DeShields received notice of Trigo's claims on June 8, 2007.  (Docket Entry No. 30).

Trigo may argue that by virtue of their positions in giving him medical care, the defendants were in a position to provide notice to the proposed additional defendants within the limitations period.  This argument fails, however, because there is no identity of interest between the previously named and the proposed new John Doe individual defendants.  *See Jacobsen v. Osborne*, 133 F.3d at 320 ("'Identity of interest generally means that the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other.'").

As to the previously named defendants, Trigo's pleadings show that:

(1)    Chester Jones was a physician assistant at the Holliday Unit and treated Trigo in July 2003;

(2)    Joseph Curry was a physician assistant at the Holliday Unit and treated Trigo in August 2003;

(3)     Dr. Wyatt Howell was a physician working for the Price Daniel Unit of the TDCJ and treated Trigo in March 2004;

(4)     Dr. Denise DeShields was the Regional Director for the Office of Health Care Systems for the UTMB; and

(5)     Lanette Linthicum was the Division Director for Health Services at TDCJ.

With regard to the proposed new defendants, Trigo's pleadings show that:

(1)     On January 13, 2004, Dr. Hung Dao and physician assistant David Onuora treated Trigo at the Holliday Unit; and

(2)     In January 2005, physicians assistant Babbili and Dr. Barry Raff treated Trigo at the Estes Unit.

In *Edwards v. Middlesex County*, 2010 WL 2516492 (D.N.J.), the District Court of New Jersey considered a similar issue. Lillian Edwards, the administratrix of the estate of Kenneth Edwards, brought a survival and wrongful death action. At the time of his death, Edwards was a pretrial detainee at Middlesex County Correctional Center ("MCCC"). He was incarcerated at MCCC from December 12, 2006 until March 17, 2007. While an inmate at MCCC, Edwards was in the care of Middlesex County and CFG Health Services, LLC/Family Guidance Center, P.C. ("CFG"). CFG was a private provider under contract to provide medical care to inmates at MCCC. Edwards alleged that defendants Paulo Pinho and James Neal, medical doctors employed by CFG at the time of Edwards's death, were responsible for and involved in his medical treatment while he was an inmate at MCCC. Pinho and Neal were not named as defendants in the plaintiff's December 24, 2008 complaint. Nor were they joined as defendants by those who were sued. The parties engaged in discovery. The plaintiff then filed a motion for leave to amend her complaint under

26

Federal Rule of Civil Procedure 15(c) to add Pinho and Neal as defendants.  In granting the motion to amend, that court reasoned:

> In the instant action, both Pinho and Neal treated Mr. Edwards while he was an inmate at MCCC. Neal, CFG's corporate medical director, admits that he was at MCCC at least once a month and saw Mr. Edwards on March 12, 2007, several days before he was admitted to the hospital.  In this suit arising out of the alleged medical malpractice of Mr. Edwards's treating physicians it is hard to comprehend that the physicians who treated Mr. Edwards did not know that they would be named as parties in the instant suit but for a mistake as to their identities.  In any event, the Court concludes that even if Pinho and Neal did not know that they would have been named as defendants, they should have known that as physicians who treated Mr. Edwards during his incarceration they would be named as defendants in the instant suit but for Plaintiff's mistake as to their identities, thus satisfying the requirement of Rule 15(c)(1)(C)(ii).

*Edwards v. Middlesex County*, 2010 WL 2516492 (D.N.J. 2010).

The present case is distinguishable from *Edwards*.  Trigo complains of the denial of medical care over two years, at various units within the TDCJ.  Nothing in the pleadings suggests that the additional medical personnel who treated Trigo knew that they would have been named as parties in the instant suit but for a mistake as to their identities.  Given the number of units and the lengthy period over which Trigo was treated, nothing suggests that these additional medical personnel should have known that they would have been named as defendants in this suit but for a mistake as to their identities or names.  The requirements of Rule 15(c)(1)(C)(ii) are not satisfied.

The facts of this case are similar to *Whitt v. Stephens County*, 529 F.3d 278 (5th Cir. 2008). The plaintiff appealed from the denial of leave to amend the complaint to substitute actual officers for five "John Does" and from the grant of summary judgment dismissing the "John Doe" claims.

The district court denied the plaintiff's motion for leave to amend as futile because the statute of limitations would bar any claims against the officers.  The Fifth Circuit affirmed,

> We need not consider whether the court abused its discretion in denying leave to amend based on undue delay and prejudice, because we agree with that court that the statute of limitations rendered amendment of the complaint futile.  The limitations period for a § 1983 action is determined by the state's personal injury limitations period, *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998), which in Texas is two years, TEX. CIV. PRAC. & REM. CODE ANN. § 16.003.  The incident occurred in April 2004, more than two years before Whitt sought to name the John Doe defendants in the March 2007 motion to amend.
>
> The claims against the named defendants are thus time-barred unless they "relate back" to the original filing of the complaint per Federal Rule of Civil Procedure 15(c).  We have held, however, that an amendment to substitute a named party for a John Doe does not relate back under Rule 15(c).  *Jacobsen*, 133 F.3d at 320-21 (reasoning that Rule 15(c) requires a "mistake concerning the identity of the proper party" and that use of a John Doe moniker does not constitute a "mistake").  Accordingly, because Whitt's claims against the named defendants are time-barred, it would have been futile for Whitt to amend, so the district court appropriately denied the motion to amend.  Furthermore, and relatedly, the court properly granted summary judgment to the John Does, because any claims against parties named in their place would be barred by limitations.

*Whitt*, 529 F.3d at 283-84.

In *Krupski,* the Court stressed that the question is whether defendant knew or should have known within the service period that it would have been named in the original complaint but for a mistake of some sort.  The Court explained:

> By focusing on Krupski's knowledge, the Court of Appeals chose the wrong starting point.  The question under Rule 15(c)(1)(C)(ii) is not whether Krupski knew or should have known the identity of Costa Crociere as the proper defendant, but whether Costa Crociere knew or should have known that it would have been named as a defendant but for an error.  Rule 15(c)(1)(C)(ii) asks what the prospective

*defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint.

Information in the plaintiff's possession is relevant only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity. For purposes of that inquiry, it would be error to conflate knowledge of a party's existence with the absence of mistake. A mistake is "[a]n error, misconception, or misunderstanding; an erroneous belief." BLACK'S LAW DICTIONARY 1092 (9th ed. 2009); *see also* Webster's THIRD NEW INTERNATIONAL DICTIONARY 1446 (2002) (defining "mistake" as "a misunderstanding of the meaning or implication of something"; "a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention"; "an erroneous belief"; or "a state of mind not in accordance with the facts"). That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity. A plaintiff may know that a prospective defendant-call him party A-exists, while erroneously believing him to have the status of party B. Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the "conduct, transaction, or occurrence" giving rise to her claim. If the plaintiff sues party B instead of party A under these circumstances, she has made a "mistake concerning the proper party's identity" notwithstanding her knowledge of the existence of both parties. The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him.

Respondent urges that the key issue under Rule 15(c)(1)(C)(ii) is whether the plaintiff made a deliberate choice to sue one party over another. . . . We agree that making a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper party's identity. We disagree, however, with respondent's position that any time a plaintiff is aware of the existence of two parties and chooses to sue the wrong one, the proper defendant could reasonably believe that the plaintiff made no mistake. The reasonableness of the mistake is not itself at issue. As noted, a plaintiff might know that the prospective defendant exists but nonetheless harbor a misunderstanding about his status or role in the events giving rise to the claim at issue, and she may mistakenly

choose to sue a different defendant based on that misimpression. That kind of deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied.

This reading is consistent with the purpose of relation back: to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits. *See, e.g.,* Advisory Committee's 1966 Notes 122; 3 MOORE'S FEDERAL PRACTICE §§ 15.02[1], 15.19[3][a] (3d ed. 2009). A prospective defendant who legitimately believed that the limitations period had passed without any attempt to sue him has a strong interest in repose. But repose would be a windfall for a prospective defendant who understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity. Because a plaintiff's knowledge of the existence of a party does not foreclose the possibility that she has made a mistake of identity about which that party should have been aware, such knowledge does not support that party's interest in repose.

. . .

Applying these principles to the facts of this case, we think it clear that the courts below erred in denying relation back under Rule 15(c)(1)(C)(ii). . . . Because the complaint made clear that Krupski meant to sue the company that "owned, operated, managed, supervised and controlled" the ship on which she was injured, and also indicated (mistakenly) that Costa Cruise performed those roles, Costa Crociere should have known, . . . that it was not named as a defendant in that complaint only because of Krupski's misunderstanding about which "Costa" entity was in charge of the ship - clearly a "mistake concerning the proper party's identity."

*Krupski,* 130 S.Ct. at 2493-94, 2497 (emphasis in original; footnote and internal citations omitted).

The Court made it clear that the focus of the inquiry under Rule 15(c) should not be on a plaintiff's knowledge of the existence of the party the plaintiff seeks to add as a defendant, nor on the reasonableness of the plaintiff's mistaken understanding of that party's role. But the plaintiff must make a *mistake* about the unnamed party, and, but for that mistake, the unnamed party would

have been named as a defendant and was on notice that, but for the mistake, would have been named.

In the present case, there has been no such mistake.  The plaintiffs did not mistakenly sue party A instead of party B.  Rather, the current defendants are prison medical personnel who treated Trigo.  Trigo now alleges that, through discovery, he has learned about additional medical personnel who were also involved in denying him adequate medical care.  This is not the type of "mistaken identity" that Rule 15 is intended to address.  Instead, this is a purported lack of knowledge about additional parties who treated the plaintiff.  In the Fifth  Circuit, lack of knowledge of a proposed new defendant is not a "mistake concerning the party's identity" within the meaning of Rule 15(c).  *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998); *Moore v. Tennessee,* 267 Fed. App'x 450, 455 (6th Cir. 2008) (citing *Cox v. Treadway,* 75 F.3d 230, 240 (6th Cir. 1996) ("Substituting a named defendant for a 'John Doe' defendant is considered a change in parties, not a mere substitution of parties.")).

Even if this were a case of "mistaken identity," nothing in Trigo's original complaints naming Linthicum, Raimer, Jones,  Curry,  Howell, and DeShields as defendants would have put the proposed new medical defendants on notice that Trigo would have named them as defendants but for a mistake.

In *Krupski,* there was no dispute as to whether the prospective defendant had received sufficient notice of the action within the period set forth by Federal Rule of Civil Procedure 4(m).  Indeed, in *Krupski* the new defendant did not challenge the district court's finding that it had "constructive notice" of the plaintiff's complaint within the Rule 4(m) period.  *Krupski,* 130 S. Ct. 2485, at 2488, 2492.  Additionally, unlike the case at bar, the Supreme Court noted that "[n]othing

in Krupski's conduct during the Rule 4(m) period suggests that she failed to name [the prospective defendant] because of anything other than a mistake." *Id.* at 2489.

Nor does the record disclose a basis to toll limitations. Trigo filed his amended complaint more than two years after the limitations period expired. Trigo was represented by counsel and the defendants provided that counsel with Trigo's medical records in August 2007.

The record discloses no justification for equitable tolling of limitations as to the "John Doe" medical personnel. Trigo may not amend his complaint to substitute the additional medical personnel for the John Doe defendants. *See Jacobsen*, 133 F.3d at 320.

## V.      Exhaustion of Administrative Remedies

Under 42 U.S.C. § 1997e, a prisoner may not file a suit under § 1983 unless the administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a) (Supp. 1996). Exhaustion is a prerequisite to suit even when the prisoner seeks relief not available in grievance proceedings, such as money damages. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001). When a prisoner fails to exhaust his administrative remedies before filing suit without a valid excuse, the court may dismiss the action without prejudice to its refiling after the prisoner exhausts his administrative remedies. *See Wendell v. Asher*, 162 F.3d 887, 890-92 (5th Cir. 1998);[3] *Gordon v. Pettiford*, 271 Fed. App'x 464, 464 (5th Cir. 2008) (per curiam). When exhaustion is precluded because the deadlines for the administrative remedies have passed, the action is properly dismissed with prejudice. *Johnson v. La. ex rel. La. Dep't of Pub. Safety & Corr.*, 468 F.3d 278, 278-81 (5th Cir. 2006) (per curiam).

---

[3]   Although *Wendell* was partially overruled by *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910 (2007), *see Richbourg v. Horton*, No. 08-10443, 2008 WL 5068680, at *1 (5th Cir. Dec. 2, 2008) (per curiam), the proposition for which it is cited remains good law.

A court does not "inquire whether administrative procedures satisfy minimum acceptable standards of fairness and effectiveness"; prisoners simply "must exhaust such administrative remedies as are available, whatever they may be." *Alexander v. Tippah County*, 351 F.3d 626, 630 (5th Cir. 2003) (citations and internal quotation marks omitted).  Substantial compliance with administrative procedures is insufficient.  *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).  Unless the prisoner pursues his "grievance remedy to conclusion," he has not exhausted "available remedies."  *Id.*  Failure to exhaust administrative remedies under the PLRA is an affirmative defense.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Carbe v. Lappin*, 492 F.3d 325, 327 (5th Cir. 2007).

TDCJ prisoners must pursue their administrative remedies under a two-step grievance procedure.  *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).  An inmate has fifteen days from the date of the incident to file a Step 1 grievance, which is handled within the prison facility.  *Id.*  If the prison returns a grievance unprocessed, the inmate has fifteen days to correct the grievance and resubmit it.  If unsatisfied with the response, the inmate has fifteen days to file a Step 2 grievance, which is handled at the state level.  *Johnson*, 385 F.3d at 515.

Trigo states that he initiated TDCJ's informal resolution process by writing a letter to the Patient Liaison Program on October 16, 2004.  Trigo received a reply on November 9, 2004, informing him that the Patient Liaison Program no longer accepted complaints from offenders, and directing him to send his complaint to Charles Hurst, the Facility Health Administrator.  Trigo sent an I-60 request for a meeting with Charles Hurst, but received a reply stating that Hurst had not worked as the Facility Health Administrator in two years.  Trigo initiated the formal grievance process on October 27, 2004 by submitting a Step 1 grievance.  TDCJ responded to Trigo's Step 1

grievance on November 17, 2004.  Trigo submitted a Step 2 grievance on December 2, 2004.  TDCJ responded to Trigo's Step 2 grievance on January 4, 2005.

Trigo alleges that Dr. Talley denied his request for Hepatitis C treatment on April 22, 2004 and July 21, 2004.  (Docket Entry No. 82, pp. 5-6).  Dr. Talley argues that Trigo did not initiate a complaint until October 16, 2004, by writing a letter, and did not file a Step 1 grievance until October 27, 2004, three months after the last alleged denial of treatment.  (Docket Entry No. 96). Because Trigo failed to comply with TDCJ's established two-step grievance process by timely filing a Step 1 grievance within fifteen days after the incidents – April 22, 2004 and July 21, 2004 – Dr. Talley argues that the claims against her are barred by § 1997e(a) and must be dismissed.

As to the Jones Defendants, Trigo alleges that Jones ordered lab tests in July 2003 and that on August 15, 2003, Curry told Trigo that he had to be incarcerated a year to get treatment.  Trigo alleges that he believed they had violated his rights by denying him hepatitis C treatment.  Trigo did not file any grievance against them.  Trigo's first written complaint was not sent until October 2004 and his first – and apparently only – grievance about his Hepatitis C treatment was not filed until October 27, 2004, more than fourteen months after his interactions with Curry and Jones.  The Jones Defendants argue that Trigo's delay thwarted the PLRA's intent of providing the agency a full and fair opportunity to adjudicate Trigo's claims against Jones and Curry and to correct its own errors.

In *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004), the Fifth Circuit considered and agreed with this position.

> Johnson's claim is that prison officials failed to protect him, over the course of some eighteen months, from near-constant sexual assault. Johnson's complaint, and his summary-judgment evidence, covers the repeated abuses in uncomfortable detail and lists many unsuccessful encounters with prison officials.  These include

34

face-to-face encounters with several guards who allegedly failed to take steps to protect Johnson on various occasions, correspondence with supervisory officials, and meetings with UCC committees.  The defendants contend that the only exhausted claims in this case are those against two defendants, Wathen and Kuyava, as regards their involvement in the March 16, 2001 UCC.  They reason that since TDCJ rules require that a Step 1 grievance be filed within fifteen days of the complained-of event, a grievance can only exhaust claims that relate to matters that occurred within the preceding fifteen days.  Therefore, Johnson's March 18 Step 1 grievance could exhaust claims arising from the March 16, 2001 UCC, but it could not exhaust any claims that arise from conduct before March 2001.  Johnson's December 2001 Step 1 grievance, which was also appealed through Step 2, failed to exhaust any claims, continue the defendants, because no UCC meeting occurred in the fifteen days preceding the filing of that Step 1 grievance.

Johnson did not use the formal grievance process – or, rather, he did not properly use it by both filing a Step 1 grievance *and* appealing the grievance to Step 2-until his March 18, 2001 Step 1 grievance.  We agree with the defendants that Johnson has not exhausted any claims that arise from events that occurred more than fifteen days before this grievance.  While it is true that the conditions that Johnson suffered both before and after the grievance were of the same general character, to permit the March 2001 grievance to reach back to events that transpired up to six months earlier would effectively negate the state's fifteen-day rule and frustrate the prison system's legitimate interest in investigating complaints while they are still fresh.  That a condition continues does not excuse the failure to file a grievance earlier.  Accordingly, we hold that Johnson's grievances do not permit him to pursue claims regarding conduct that occurred before March 2001; in particular, this means that he has not exhausted claims related to the UCC meetings of September 6, 2000, December 13, 2000, February 14, 2001, and February 21, 2001; nor has he exhausted claims regarding his encounters with Willingham, which all occurred before March 2001.

*Johnson v. Johnson*, 385 F.3d 503, 519 (5th Cir. 2004).

Similarly, while it is true that the conditions that Trigo suffered both before and after the

grievance were of the same general character, to permit the October 2004 grievance to reach back

35

to events that transpired up to fourteen months earlier would effectively negate the State's administrative grievance procedure and frustrate the prison system's legitimate interest in investigating complaints. That a condition continues does not excuse the failure to file a grievance earlier. Accordingly, Trigo's grievance does not permit him to pursue claims against specific individuals based solely on acts and omissions that occurred before October 2004. The claims against Jones, Curry, and Dr. Talley are barred on this basis. Those claims are dismissed because of the failure to exhaust administrative remedies, as the PLRA requires.

## VI.    The Claims Against Dr. Howell

Trigo asserts that Dr. Howell acted with deliberate indifference to his serious medical needs in failing to treat him for Hepatitis C while he was incarcerated in the TDCJ. Trigo argues that because a § 1983 "action survives against the liable person and the person's legal representatives," this court should substitute Robert E. Howell, as legal representative of Dr. Wyatt Howell's estate, as a party in place of Dr. Wyatt Howell. TEX. CIV. PRAC. & REM. CODE ANN. § 71.021(b). Trigo asserts that Robert E. Howell is the independent executor and sole beneficiary of Dr. Wyatt Howell's estate.

Defendant Talley responds that the motion is untimely under Federal Rule of Civil Procedure 25(a)(1), which states: "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party. . . . If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." (Docket Entry No. 102). The suggestion of death for Dr. Howell was filed on June 8, 2007. Under Rule 25, Trigo had 90 days—until September 6, 2007—to move to substitute. On September 5, 2007, Trigo's counsel moved for an extension of time to file the motion to substitute Dr. Howell's estate. (Docket

36

Entry No. 39).  The court granted the motion and extended the deadline to file a motion to substitute Dr. Howell's estate to November 5, 2007.  (Docket Entry No. 41).  Neither Trigo nor his counsel moved to substitute Dr. Howell's estate by the November 5, 2007, deadline.  Instead, on February 25, 2010, over two years after the extended deadline to file a motion to substitute Dr. Howell's estate and after the statute of limitations had expired, Trigo filed the pending motion to substitute Dr. Howell's estate in place of Dr. Howell.  (Docket Entry No. 101).

Trigo's request to substitute Dr. Howell's estate in place of Dr. Howell, (Docket Entry No. 101), is untimely.  Trigo and his counsel have been on notice since June 8, 2007, that Dr. Howell is deceased.  (Docket Entry No. 31).  Since June 19, 2007, Trigo has been represented by counsel except for a four-month period (July 3, 2008 to November 12, 2008).  Although Trigo's current counsel was not appointed until November 12, 2008, they had represented Trigo for over one year before moving to substitute Dr. Howell's estate.  The motion to substitute is denied.

**VII.   Conclusion**

The motion to dismiss filed by defendants Chester Jones, Joseph Curry, David Onuora, Dr. Hung Dao, Dr. Barry Raff, and Ananda Babbili, (Docket Entry No. 84), is granted.  The motion to dismiss filed by Dr. Talley, (Docket Entry No. 96), is granted. Trigo's motion to substitute Dr. Wyatt Howell's estate in place of Dr. Wyatt Howell, (Docket Entry No. 101), is denied.

SIGNED on August 24, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

37