**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| EDWARD TRIGO, | § | |
| (TDCJ-CID #1173465) | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-05-2012 |
| | § | |
| TDCJ-CID OFFICIALS, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Edward Trigo, is a former inmate of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ-CID"). Through counsel appointed by this court, Trigo alleged that the defendants, officials with the TDCJ and medical-care providers working for the TDCJ, violated his constitutional rights by denying him proper medical care for hepatitis C during his incarceration. This memorandum and opinion addresses two motions for summary judgment and Trigo's motion to alter judgment. Based on the pleadings, the motions and responses, and the applicable law, this court denies both motions for summary judgment as moot; finds that Trigo has abandoned his claims against Dr. Linthicum and Dr. Raimer; and denies the motion to alter judgment. These rulings, with rulings previously issued, result in final judgment, which is entered by separate order. The reasons for these rulings are set forth in detail below.

**I.     Background**

**A.     Trigo's Allegations**

Through counsel, Trigo filed an amended complaint, (Docket Entry No. 82), which this court summarized in an August 24, 2010 opinion, as follows:

Trigo alleged that he began his incarceration with TDCJ at the Travis County Jail on May 9, 2003 and was transferred to the Holliday Unit in Huntsville on July 3, 2003.  On July 10, 2003, Physician Assistant Chester Jones evaluated Trigo and ordered lab tests for Hepatitis C. The lab tests included an ALT test to measure the amount of liver enzyme in the blood.  The normal range, according to UTMB, is 9 to 51.  Trigo's ALT level was 59.  On July 17, 2003, a chronic care nurse told Trigo that he had Hepatitis C.  Trigo was placed on a "managed health care program," under which he received liver evaluations every 90 days.

On July 31, 2003, Trigo underwent additional lab tests for Hepatitis C.  These tests showed that his ALT level had risen to 162.  An ALT level above 51—the upper limits of normal—is an indication of liver damage.  On August 10, 2003, Trigo saw Physician Assistant Joseph Curry.  Trigo explained to Curry that he was concerned about the rapid rise in his liver enzyme levels and that he wanted to be treated for Hepatitis C.  Curry responded that under Policy B14.13 of the TDCJ Health Services Division Infection Control Manual, Trigo could not be considered for Hepatitis C treatment until he had been incarcerated for at least one year.

On January 13, 2004, Dr. Hung Dao and Physician Assistant David Onuora examined Trigo and ordered liver enzyme tests.  The reports showed that Trigo's ALT level was 378.  This was the second liver enzyme test within six months that showed Trigo's ALT level as more than twice the upper limits of normal.  Trigo was eligible for Hepatitis C treatment under Policy B-14.13 at this point.  He alleges that Dr. Hung Dao, Chester Jones, Joseph Curry, and David Onuora took no action.  During the eight months that Trigo was under their care, he was never referred to a liver specialist for a further liver evaluation or recommended for Hepatitis C treatment under the "clinical pathway" described in Policy B-14.13.  Trigo alleges that Dr. Dao, Jones, Curry, and Onuora were deliberately indifferent to his serious medical need for Hepatitis C treatment.  (Docket Entry No. 82, Amended Complaint, p. 3).

TDCJ transferred Trigo to the Byrd Unit on February 11, 2004 and to the Price Daniel Unit on February 20, 2004.  Trigo received a medical evaluation from Dr. Wyatt Howell at the Price Daniel Unit on March 1, 2004.  Trigo told Dr. Howell and CID Nurse Babbs about his high liver enzyme levels and asked for treatment for his hepatitis.  Dr. Howell responded that he had to order lab work and submit the request to a committee at Texas Tech for a decision on

2

whether Trigo met TDCJ's criteria for treatment.  Trigo's lab results came back on March 8, 2004.  They showed that his ALT level was 469.  The normal ALT range set by Texas Tech was 30-65.

On April 22, 2004, Dr. Sheri Talley denied Trigo's request for Hepatitis C treatment.  The decision was based on the provision of Policy B-14.13 that an inmate with less than six months remaining on his prison sentence was ineligible for treatment because it could not be completed within the period of incarceration.  Trigo had less than six months remaining before his projected date for release on parole of August 23, 2004.

On May 21, 2004, Babbs told Trigo that Texas Tech had denied his request for Hepatitis C treatment in accordance with Policy B-14.13 because although he otherwise met the criteria for treatment, he had a discretionary release date of August 23, 2004 and therefore might be unable to complete the treatment while incarcerated.  Neither Babbs nor anyone else asked Trigo if he would be able to continue the treatment if he was released before it was completed.

In June 2004, Trigo received a letter from the parole board denying his discretionary release date of August 23, 2004 and stating a new release date of May 8, 2006.  On June 5, 2004, Trigo told Babbs about the parole board's action and asked to be treated for Hepatitis C.  Babbs told Trigo that he would have to resubmit his paperwork to Texas Tech for approval.  On July 21, 2004, Dr. Talley denied Trigo's request for Hepatitis C treatment because his serum creatinine level was greater than the upper limits of the normal range and his iron and ferritin levels were elevated.  On August 20, 2004, Babbs informed Trigo that Texas Tech had denied his request for Hepatitis C treatment because his creatinine and ferritin levels were slightly above the criteria set by Texas Tech.

On October 10, 2004, Dr. Howell again denied Trigo's request for Hepatitis C treatment.  At that time, Trigo's hemoglobin A1C level was 5.9, slightly above what Texas Tech set as the upper limit of normal, 5.7.  TDCJ transferred Trigo to the Estes Unit on January 5, 2005.  On January 13, 2005, Dr. Barry Raff performed an initial medical evaluation at the Estes Unit.  Dr. Raff told Trigo that after lab work, he would evaluate Trigo's medications because they were designed for a person with normal liver function and might have been contributing to the increased creatinine and ferritin levels.  Dr. Raff changed Trigo's medications to 40 mg. per day of Hydrochlothiazide and 40 mg. per day of Furosemide, and discontinued Ranitidine and

3

enteric aspirin. A blood test on January 13, 2005 showed an ALT level of 233. The Estes Unit used the ALT normal range set by UTMB of 0-40.

On January 24, 2005, Physician Assistant Ananda Babbili called Trigo to the infirmary. Trigo told Babbili that he was not feeling well. He had pitting edema in both legs from his knees to his toes and a distended abdomen. Trigo was told that he might be going into heart and/or kidney failure. Dr. Turner and Babbili decided via videoconference to transport Trigo to the John Sealy Hospital in Galveston. The next day, Dr. Lafuente and Dr. Miller ordered lab work and a sonogram of Trigo's heart, liver, and abdomen. On January 27, 2005, Dr. Lafuente and Dr. Miller informed Trigo that his heart and kidneys were fine, but he had cirrhosis of the liver. On January 28, 2005, Trigo was discharged from John Sealy Hospital and was transported to the Estelle Unit to await transportation to the Estes Unit.

Trigo arrived at the Estes Unit on February 16, 2005. The following day, Trigo asked Dr. Raff about submitting a request for Hepatitis C treatment. Dr. Raff told Trigo that he would not treat him for Hepatitis C because of complicating factors caused by the cirrhosis. On February 28, 2005, Trigo spoke with CID Nurse Smith about applying for Hepatitis C treatment. Smith told Trigo that she would have to review his records and consult with Babbili to decide how to proceed. On April 4, 2005, Trigo attended an appointment with Babbili to address pitting edema in both of his legs from his knees to his toes, as well as a severely distended abdomen. Babbili administered 8 cc of Furosemide and increased Trigo's Spironolactone from 100 mg. per day to 150 mg. per day. Babbili told Trigo that UTMB would not treat him for Hepatitis C because of the cirrhosis.

On April 10, 2005, Trigo submitted a sick call request and told the nurse that his condition had not changed since April 4, 2005. The nurse decided not to change Trigo's treatment until he could be transported to John Sealy Hospital to see a gastrointestinal specialist. On April 20, 2005, Trigo submitted another sick call request and told the nurse that his condition had worsened. On April 22, 2005, a nurse examined Trigo and determined that he had a severely distended abdomen and +4 pitting edema in both legs from his knees to his toes. Dr. Turner examined Trigo via video conference and determined that he needed to be transferred to John Sealy Hospital immediately. On April 23, 2005, an internal medicine doctor at John

4

Sealy examined Trigo and told him that he would need a liver
transplant in the next five years and should not expect to live to be an
old man.  Trigo also underwent a paracentesis procedure to remove
excess fluid from his abdomen.  Trigo lost 22 pounds of fluid during
his hospital stay.

On June 9, 2005, Trigo filed this lawsuit.  On May 8, 2006, Trigo was
released from TDCJ.  Following his release, Trigo received treatment
for his Hepatitis C from the VA hospital.  The treatment cleared the
Hepatitis C infection, but Trigo still suffers from cirrhosis and will
eventually require a liver transplant.  (Docket Entry No. 82).

(Docket Entry No. 113, pp. 5-9).

Trigo sued the TDCJ and certain of its officials; the University of Texas Medical Branch

(UTMB) and members of its medical staff; the Texas Tech University Health Science Center

(TTUHSC) and members of its medical staff; the Medical Director of the TTUHSC; Dr. Ben

Raimer, Medical Director of UTMB Correctional Managed Care; Chester Jones and Joseph Curry,

physician assistants with UTMB; Dr. Wyatt Howell, a physician working for the Price Daniel Unit

of the TDCJ; Dr. Denise DeShields, the Regional Director of the Office of Health Care Systems for

the UTMB; and Lannette Linthicum, the Division Director for Health Services at TDCJ.  Trigo

alleged that the failure to treat the hepatitis C led to his cirrhosis and that the failure to treat

amounted to deliberate indifference to his serious medical need, violating his constitutional rights.

### B.    Procedural History

On December 16, 2005, this court dismissed Trigo's complaint.  (Docket Entry No. 11).  On

February 16, 2007, the United States Court of Appeals for the Fifth Circuit vacated and remanded

for further proceedings.  (Docket Entry No. 24).  The Fifth Circuit determined that Trigo had

asserted that the denial of medical treatment was based on TDCJ policy rather than specific medical

reasons and that the challenge to the policy deserved to proceed.  Defendants Lannette Linthicum,

5

Chester Jones, Joseph Curry, Dr. Ben Raimer, and Dr. Denise DeShields answered and the Texas Attorney General's Office filed a suggestion of death as to Dr. Wyatt Howell. (Docket Entry Nos. 30, 31).       On October 30, 2009, Trigo, through counsel, filed a first amended complaint naming nine defendants.   He reasserted his claims against four of the defendants named in his original complaint, Chester Jones, Joseph Curry, Dr. Wyatt Howell, and Dr. Denise DeShields.   He also named the following five new defendants:

     (1)    David Onuora, a physician assistant working for UTMB/TDCJ;

     (2)    Dr. Hung Dao, a physician at TDCJ's Holliday Unit;

     (3)    Dr. Sheri Talley, a physician at the Price Daniel Unit;

     (4)    Dr. Barry Raff, a physician at the Sanders Estes Unit; and

     (5)    Ananda Babbili, a physician assistant working for UTMB/TDCJ.

(Docket Entry No. 82, pp. 1-2).

     Chester Jones, Joseph Curry, David Onuora, Dr. Hung Dao, Dr. Barry Raff, and Ananda Babbili (collectively referred to as "the Jones Defendants"), and Dr. Talley, moved to dismiss Trigo's first amended complaint.   The motion to dismiss the claims against Jones and Curry was based on the argument that Trigo had failed to exhaust his state-court remedies. The motion to dismiss the claims against David Onuora, Dr. Hung Dao, Dr. Barry Raff, Ananda Babbili, and Dr. Talley was based on limitations.   (Docket Entry Nos. 84, 96).   On August 24, 2010, this court granted both motions to dismiss and dismissed Trigo's claims against the following seven defendants: Jones, Curry, Onuora, Dao, Babbili, Raff, and Dr. Talley.   (Docket Entry No. 113).   Dr. DeShields also filed a motion to dismiss, which this court granted in part and denied in part.   Trigo's claims against Dr. DeShields based on respondeat superior were dismissed and the claims relating

6

to her role in setting, monitoring, and enforcing TDCJ policy on treating hepatitis C were retained. (Docket Entry No. 65).

While these motions to dismiss were pending, the Jones Defendants filed a motion for summary judgment on August 10, 2010. (Docket Entry No. 109). Dr. Talley and Dr. DeShields filed a separate motion for summary judgment on August 12, 2010. (Docket Entry No. 112). In their motions for summary judgment, the Jones Defendants and Dr. Talley reasserted their arguments that Trigo's claims were unexhausted and barred by limitations. The defendants also addressed the merits of Trigo's claims. Trigo had not responded to the motions for summary judgment when this court granted the motions to dismiss against the defendants other than Dr. DeShields. Because this court had already granted the motions to dismiss filed by the Jones Defendants and Dr. Talley, their later motions for summary judgment, (Docket Entry Nos. 109 and 112), were moot. After this court ruled on the motions to dismiss, Trigo asked for an extension of time to respond to the summary judgment motion filed by Dr. DeShields to evaluate his claims against this defendant. The extension of time was granted. On September 10, 2010, Trigo filed a stipulation of dismissal of all claims against Dr. DeShields with prejudice. (Docket Entry Nos. 120, 121).

## II.    The Claims Against Dr. Linthicum and Dr. Raimer

Trigo did not name Dr. Linthicum and Dr. Raimer as defendants in his amended complaint. (Docket Entry No. 82, pp. 1-2). Dr. Linthicum was the Division Director for Health Services at TDCJ, and Dr. Raimer was the Medical Director of UTMB Correctional Managed Care. An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier

pleading, *King v. Dogan,* 31 F.3d 344, 346 (5th Cir. 1994).  Trigo's amended complaint did not refer

to his original complaint.  Moreover, because Trigo is proceeding through counsel, his pleadings are

not entitled to liberal construction.  *See Beasley v. McCotter,* 798 F.2d 116, 118 (5th Cir. 1986)

(noting that this court does not give attorney-prepared briefs the benefit of liberal construction);

*Olivares v. Martin,* 555 F.2d 1192, 1194 n.1 (5th Cir. 1977) (holding that attorney litigant is not

entitled to same liberal construction accorded pro se litigants).  Because Dr. Linthicum and Dr.

Raimer were not named in the amended complaint, Trigo's claims against them have been

abandoned.

## III.    The Claims Against Dr. Howell

Trigo asserted that Dr. Howell acted with deliberate indifference to his serious medical needs

in failing to treat him for hepatitis C while he was incarcerated in the TDCJ.  Trigo argued that

because a § 1983 "action survives against the liable person and the person's legal representatives,"

this court should substitute Robert E. Howell, as legal representative of Dr. Wyatt Howell's estate,

as a party in place of Dr. Wyatt Howell.  TEX. CIV. PRAC. & REM. CODE ANN. § 71.021(b).  Trigo

asserted that Robert E. Howell is the independent executor and sole beneficiary of Dr. Wyatt

Howell's estate.  Dr. Sheri Talley, a doctor at the Price Daniel Unit, responded that the motion was

untimely under Federal Rule of Civil Procedure 25(a)(1).  That rule states: "[i]f a party dies and the

claim is not extinguished, the court may order substitution of the proper party. . . . If the motion is

not made within 90 days after service of a statement noting the death, the action by or against the

decedent must be dismissed."  (Docket Entry No. 102).

The suggestion of death for Dr. Howell was filed on June 8, 2007.  Under Rule 25, Trigo had

90 days—until September 6, 2007—to move to substitute.  On September 5, 2007, Trigo's counsel

8

moved for an extension of time to file the motion to substitute Dr. Howell's estate.  (Docket Entry No. 39).  This court granted the motion and extended the deadline to file a motion to substitute Dr. Howell's estate to November 5, 2007.  (Docket Entry No. 41).  Neither Trigo nor his counsel moved to substitute Dr. Howell's estate by the November 5, 2007 deadline.  Instead, over two years later, on November 25, 2009, Trigo filed a motion for an extension of time until February 26, 2010, to file a motion to substitute.  (Docket Entry No. 86).  This court granted the motion.  (Docket Entry No. 87).  On February 25, 2010, Trigo filed the motion to substitute Dr. Howell's estate in place of Dr. Howell.  (Docket Entry No. 101).

In the August 24, 2010 order, this court held that Trigo's request to substitute Dr. Howell's estate, (Docket Entry No. 101), was untimely.  (Docket Entry No. 113).  Trigo has filed a motion to alter that judgment.  He argues that the November 25, 2009 order extended the time to file a motion to substitute to February 26, 2010.

The problem with Trigo's argument is that the motion for extension of time, (Docket Entry No. 86), was itself untimely and should not have been granted.  As this court noted in its August 24, 2010 order, the statement of Dr. Howell's death was filed on June 8, 2007.  (Docket Entry No. 31).  Since June 19, 2007, Trigo has been represented by counsel except for a four-month period from July 3, 2008 to November 12, 2008.  Trigo moved for the first extension of time to move to substitute Dr. Howell's estate within 90 days after the June 8, 2007 filing of the statement of death.  That motion was granted, giving Trigo until November 5, 2007, to move to substitute.  (Docket Entry No. 41).  Trigo was represented by counsel—although not current counsel—when that deadline to move to substitute Dr. Howell's estate expired.  But no motion to substitute was filed

within the extended period to do so.  No request for another extension was made for almost two years.  When that request was made, there was no basis to grant it, and it should not have been granted.

Notwithstanding the mandatory language of Rule 25(a)(1), courts have held that a Rule 6(b) motion to enlarge the time within which to move for substitution under Rule 25(a), even one brought delinquently, may be entertained by a court within its discretion if the moving party shows excusable neglect.  A district court is authorized "to exercise its discretion to permit a motion for substitution beyond the time originally prescribed [by Rule 25(a)(1)] when the failure to file the motion was the result of excusable neglect."  *Kaubisch v. Weber,* 408 F.3d 540, 542 (8th Cir. 2005). Rule 6(b) provides that "upon motion made after the expiration of the specified period the district court may permit the act to be done where the failure to act was the result of excusable neglect," with the exception of certain enumerated time limits not here pertinent. Rule 6(b)(2).  *See Al-Jundi v. Rockefeller,* 88 F.R.D. 244, 247 (W.D.N.Y. 1980); *see Jones Inlet Marina, Inc. v. Inglima,* 204 F.R.D. 238, 239 (E.D.N.Y. 2001) ("Notwithstanding the mandatory language in Rule 25(a), the district court has considerable discretion in addressing the timing of substitution in the event of the death of a party."); *Kasting v. Am. Family Mut. Ins. Co.,* 196 F.R.D. 595, 601 (D. Kan. 2000) ("Whether an action should be dismissed for failure to comply with the 90 day time limit lies within the sound discretion of the district court," and Rule 26(a)(1) should be liberally interpreted to fulfill its underlying purpose of allowing flexibility in substitution).  This was the approach this court followed in granting the motion for extension filed by Trigo's counsel in 2007.  The problem arises from Trigo's failure to file the motion to substitute within the extended deadline and the failure for more than two years to seek any additional extension or to move to substitute.

The record shows that on June 19, 2007, the court appointed Craig Olsen to represent Trigo in this action.  (Docket Entry No. 32).  In the motion for extension of time filed on September 5, 2007, Olsen argued that the suggestion of death filed by the Texas Attorney General's Office did not provide sufficient information to identify the representative of Dr. Howell's estate.  (Docket Entry No. 39).  Olsen explained that on August 14, 2007, defense counsel had informed him that TTUHSC wanted separate representation and that new counsel would be appearing on behalf of TTUHSC and its employees.  This court granted the extension of time to move to substitute.

On October 15, 2007, Olsen moved to withdraw as Trigo's counsel, (Docket Entry No. 43). The court granted that motion on October 17, 2007.  (Docket Entry No. 44).  On the same date, the court also appointed Andrew Rogers Swartz to represent Trigo.  (Docket Entry No. 44).  On July 1, 2008, he moved to withdraw. (Docket No. 54).  The court granted this motion on July 3, 2008. (Docket Entry No. 56).  On October 20, 2008, Trigo moved for the appointment of new counsel. On November 12, 2008, the court appointed Suellen Ratliff Perry, Dane C. Ball, and Clayton Alan Morton to represent Trigo.  (Docket Entry Nos. 62, 66).  On November 18, 2008, this court granted a joint motion for continuance of the case for 90 days.  (Docket Entry No. 69).  The parties filed a joint status report on February 18, 2009, (Docket Entry No. 74).  On October 5, 2009, this court granted Trigo's motion for extension of time to add parties and amend pleadings.  (Docket Entry No. 80).  On October 30, 2009, Trigo filed his first amended complaint.  (Docket Entry No. 82).  On November 25, 2009, Trigo filed the second motion to extend the time to file the motion to substitute.

In his second motion for extension of time to file a motion to substitute, Trigo argued that Dr. Howell would not be prejudiced because he was deceased and his estate should compensate victims who suffered injury as a result of the actions he took during his life.  (Docket Entry No. 86).

11

Trigo argued that Dr. Howell's estate could obtain "free" legal representation from the Texas Attorney General.

Second, Trigo argued that the delay in filing a motion to substitute Dr. Howell's estate had been long but not unreasonable. Trigo filed this motion to extend time as soon as he became aware of the filing deadline and that the deadline had passed. Trigo maintained that granting his motion to extend time to substitute Dr. Howell's estate would not result in any delay of these proceedings.

Third, Trigo argued that the reason for the delay in filing the motion to substitute was beyond his control. In an affidavit attached to the motion for extension, Trigo stated that he is not a lawyer and did not know he was required to file a motion to substitute Dr. Howell's estate under Federal Rule of Civil Procedure 25. He further stated that one of his former lawyers said that he was going to file a motion to substitute Dr. Howell's estate in place of Dr. Howell. Finally, Trigo argued that he had acted in good faith because his failure to file a motion to substitute Dr. Howell's estate was due to his lack of knowledge of the Federal Rules of Civil Procedure, and his former attorneys' neglect of deadlines. Dismissing Dr. Howell from this lawsuit would constitute a windfall for his estate and would be unfair to Trigo.

In their response to the motion to substitute, defendants Denise DeShields and Sheri Talley emphasized that Trigo's allegations are based on events occurring during his incarceration in TDCJ from July 3, 2003 to May 8, 2005, and the applicable two-year statute of limitations expired on May 8, 2007. They argued that not only has the deadline to substitute expired, the two-year statute of limitations also expired over two years ago. The defendants also assert that because of the timing of the filings and the delays, the Office of the Attorney General never received permission from Dr. Howell to represent him in this suit. (Docket Entry No. 102, p. 1 n.1). As a result, Dr. Howell's

12

estate will be required to obtain private counsel to defend, including on time-barred claims.  They emphasized that at a minimum, there will be extensive further delay.

The case law has addressed what considerations should inform the exercise of the court's discretion under Rule 25(a).  *See Kaubisch v. Weber,* 408 F.3d 540, 542 (8th Cir. 2005); *see also George v. United States,* 208 F.R.D. 29, 33 (D. Conn. 2001) (relief may be granted from the 90-day restriction, even if the request is made after the deadline expired, if the delay results from excusable neglect and the opposing party fails to demonstrate undue prejudice); *Kessler v. Southeast Permanente Medical Group of N.C., P.A.,* 165 F.R.D. 54, 57 (E.D.N.C. 1995) (the movant is required to show excusable neglect when it failed to file a timely motion for substitution after the suggestion of death was made on the record).  "The determination as to what sort of neglect is considered excusable is an equitable one, taking account of all relevant circumstances surrounding the party's own omission."  *Kaubisch,* 408 F.3d at 543 (internal quotations and citations omitted); *see also Kasting v. Am. Family Mut. Ins. Co.,* 196 F.R.D. at 602 (recognizing that excusable neglect is "an elastic concept"); *Zeidman v. General Acc. Ins. Co.,* 122 F.R.D. 160, 162 (S.D.N.Y. 1988) (the party seeking enlargement of 90-day period prescribed by Rule 25(a) must show both good faith and a good reason for noncompliance).  The length of delay caused by the movant's noncompliance is relevant to this inquiry.  *Zeidman v. Gen. Accident Ins. Co.,* 122 F.R.D. 160, 162 (S.D.N.Y. 1988).

Typically, a successful showing of excusable neglect requires the movant to show good faith and a good reason for noncompliance with the 90-day deadline.  4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1165 (1987).  The movant is required to show good faith and a "reasonable basis for noncompliance within the time specified in [Rule 25(a)]."  *Id.; see also Kasting v. Am. Family Mut. Ins. Co.,* 196 F.R.D. at 602.  Neither showing is

present on this record.

The court has significant concerns about granting the motion to substitute.  The record does not present a reasonable basis for noncompliance with the extended deadline.  Since June 19, 2007, Trigo has been represented by counsel except for a four-month period from July 3, 2008 to November 12, 2008.  The lapse of time, in combination with the other delays in this case, raises significant concerns about limitations and the availability of witnesses and other sources of proof that would be available to defend claims against Dr. Howell's estate.  Other concerns arise from the basis for the Fifth Circuit's remand.  The court's opinion made it clear that the remand was based on Trigo's allegations that he was denied treatment for hepatitis C for reasons unrelated to any medical reason or to the decisions of any medical provider.  The Fifth Circuit explained:

> The district court dismissed Trigo's complaint as frivolous pursuant to 28 U.S.C. § 1915A.  Trigo argues that the district court erred in dismissing his complaint as frivolous because the appellees exhibited deliberate indifference to his serious medical needs.  He asserts that the extremely high levels of his liver enzymes, as shown by laboratory reports, established that the appellees should have known that the delay or denial of treatment would cause serious harm to his liver.  Trigo focuses on appeal on two occasions when he was denied treatment for allegedly nonmedical reasons.  First, he contends that he was denied treatment for hepatitis C in August 2003 based on a policy requiring that inmates be incarcerated for 12 months before they received treatment.  Second, he asserts that he was denied treatment in May 2004 based on a policy that treatment would be provided only if the inmate was not due to be discharged within 12 months.  Trigo contends that he did not receive any medication for hepatitis C and that the failure to treat this condition resulted in his developing cirrhosis of the liver.
>
> . . .
>
> Trigo has asserted the denial of medical treatment for hepatitis C based on policy, rather than on medical, reasons and that he was substantially harmed by the denial of treatment because this led to his developing cirrhosis.  Given these allegations, the district court erred

14

in dismissing Trigo's complaint as frivolous. *See Wilson,* 501 U.S. at 301-03, 111 S. Ct. 2321; *see also, McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir. 2004). Accordingly, we vacate the district court's judgment and remand for further consideration in light of this decision.

*Trigo v. Tex. Dep't of Criminal Justice - Institutional Div. Officials*, 225 Fed. App'x 211, 2007 WL

595056, **1 (5th Cir. 2007).

In his amended complaint, Trigo alleged as follows:

. . .

21.  Trigo received a medical evaluation from Dr. Wyatt Howell, M.D., on or about March 1, 2004.  Trigo informed Dr. Howell and CID Nurse Babbs about his high liver enzyme levels and requested treatment for Hepatitis C.  Dr. Howell told Trigo that he had to order lab work and submit the request to a committee at Texas Tech, who would then determine whether Trigo met TDCJ's criteria for treatment.

22.  Trigo's lab results came back on March 8, 2004 and showed that Trigo's ALT level was 469.  The normal range for ALT set by Texas Tech was 30-65.

23.  On April 22, 2004, Dr. Sheri Talley, M.D., denied Trigo's request for Hepatitis C treatment in accordance with Policy B-14.13 because Trigo had less than six month remaining before his projected release date of August 23, 2004. . . .

24.  On or about May 21, 2004, Babbs told Trigo that Texas Tech had denied his request for Hepatitis C treatment in accordance with Policy B-14.13 because although he met the criteria for treatment, he had a discretionary release date of August 23, 2004 and therefore might be unable to complete the treatment while incarcerated.

25.  In June 2004, Trigo received a letter from the parole board informing him that it had denied his discretionary release date of August 23, 2004, and that his new release date was May 8, 2006.

26.  Trigo promptly sent an I-60 request to see Babbs.  On or about June 5, 2004, Trigo informed Babbs that the parole board had denied his release date of August 23, 2004, and that he wanted to be treated

15

for Hepatitis C.  Babbs told Trigo that to receive treatment he would have to resubmit his paper work to Texas Tech for approval.

27.  On or about June 8, 2004, a lab technician drew Trigo's blood for lab work, and Trigo resubmitted his paperwork and request for Hepatitis C treatment to Texas Tech.

28.  On July 21, 2004, Dr. Talley denied Trigo's request for Hepatitis C treatment because his serum creatinine level was greater than the upper limits of normal, as set by Texas Tech, and his iron and ferritin levels were elevated.

29.  On or about August 20, 2004, Babbs informed Trigo that Texas Tech had denied his request for Hepatitis C treatment because his creatinine and ferritin levels were slightly above the criteria set by Texas Tech.  Trigo asked Dr. Howell and Babbs if they would order new lab work and resubmit his request for Hepatitis C treatment.  Dr. Howell and Babbs resubmitted Trigo's request for Hepatitis C treatment shortly thereafter.

30.  On or about October 10, 2004, Dr. Howell denied Trigo's request for Hepatitis C treatment because Trigo's Hemoglobin A1C level was 5.9, and the upper limit of normal was 5.7, as set by Texas Tech.

(Docket Entry No. 82, Amended Complaint, pp. 3, 5-6).

Trigo's amended complaint alleges that the denial of treatment for his hepatitis care was not based on a medical decision by Dr. Howell about whether Trigo did or did not need the treatment on medical grounds.  Instead, the treatment was denied based on a TDCJ policy set by others.

During Trigo's deposition, the following exchange took place between Trigo and his counsel:

Q.      Do you in your First Amended Complaint where you allege that Dr. Howell refused to treat you for Hepatitis C because your hemoglobin Alc level was 5.9 and 5-point - instead of 5.7?

A.      Yes, except at the time it was my understanding it wasn't Dr. Howell that had refused me treatment.  It was the same people who had done it the first two times, the Texas Tech Medical Committee, whoever that consisted of.

16

> Q.   But that is one of your allegations against Dr. Howell; is that correct?
>
> A.   Yes.
>
> Q.   And you believe that Dr. Howell should have either recommended you for further treatment or initiated the treatment process himself?
>
> A.   Yes.  At least, you know, referred you to more evaluation.

(Docket Entry No. 109, Defendants' Motion for Summary Judgment, Ex. E, p. 201).  Trigo himself recognizes that Dr. Howell did not make the ultimate decision to deny treatment for Hepatitis C. Trigo's own pleadings show that he repeatedly asked Dr. Howell to do the necessary blood work and submit request for treatment, and that Dr. Howell performed the blood work and submitted the results to those in charge of deciding whether the inmate met the TDCJ policy on treatment eligibility.  Others determined that Trigo was not eligible for treatment based on the TDCJ policy. Dr. Howell was not responsible for adopting and implementing Policy B14.13, the policy that established the criteria for treating hepatitis C.  The defendants responsible for implementing this policy have all been dismissed from this lawsuit.

On reconsideration, the motion for extension of time, (Docket Entry No. 86), is denied.  For reasons stated in this court's August 24, 2010 order and in this order, the court declines to alter its earlier decision to deny Trigo's motion to substitute, (Docket Entry No. 101).  The motion to alter judgment, (Docket Entry No. 115), is denied.

## IV.   Conclusion

The pending motions are resolved as follows:

• The motion for summary judgment filed by defendants Chester Jones, Joseph Curry, David Onuora, Dr. Hung Dao, Dr. Barry Raff, and Ananda Babbili, (Docket Entry No. 109), is

moot.

- The motion for summary judgment filed by Dr. Talley and Dr. DeShields, (Docket Entry No. 112), is moot.

- The motion for leave to designate expert filed by Dr. Talley and Dr. DeShields, (Docket Entry No. 105), is moot.

- On reconsideration, the motion for extension of time, (Docket Entry No. 86), is denied as untimely.

- The motion to alter judgment, (Docket Entry No. 115), is denied.

Any remaining pending motions are denied as moot.  Final judgment is entered by separate order.

SIGNED on January 31, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge